UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNNETTE A. MALDONADO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:11-cv-01669-SEB-TAB |
| CHUCK  HAGEL Secretary, Department of Defense, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 30], filed on June 5, 2013. Plaintiff, Lynnette Maldonado, has brought this claim against Defendant Chuck Hagel, Secretary, Department of Defense, alleging that her failure to be selected for a supervisory position by her employer, the Defense Finance and Accounting Service ("DFAS" or "the Agency"), was because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  For the reasons detailed below, we GRANT Defendant's Motion for Summary Judgment.

## **Factual Background**

**The Position**

The Defense Finance and Accounting Service ("DFAS") is an agency of the Department of Defense responsible for the accounting and finance activities of the armed services. Keith Decl. ¶ 3. Within DFAS, the Resource Management Office manages the day-to-day financial and resource support operations of the Agency and consists of five offices, one of which is the

Support Services Office. Kingston Decl. ¶ 4. Bruce Keith was the director of the Support Services Office in 2010–11. Keith Decl. ¶ 3. In early 2010, the Agency initiated plans to create a new supervisory position in Support Services: Supervisory Program Analyst ("the Position"). Kingston Decl. ¶ 7. Mr. Keith was designated as the Selecting Official for the Position since it would ultimately fall under his direct supervision.[1] Keith Decl. ¶ 9.

The employee hired into the Position would be responsible for providing leadership and supervision to the Agency Program Management Office including advancing DSAF goals for establishing metrics as well as measuring the success of DFAS programs. Def.'s Br. 4. This person would also be required to supervise and manage several employees and to prepare and present briefings and presentations to management. Pl.'s Dep. 83:4–20.

## Ms. Maldonado

At the time she was interviewed for the Position, Ms. Maldonado's age was over forty and she had completed twenty-nine years of federal service, eighteen of which were in program management. Pl.'s Resp. 3. She had acquired her Master's Degree in Management, Pl.'s Resp. 11, and was a Management Analyst Team Lead with DFAS.  Compl. ¶ 8. Ms. Maldonado had been supervised by Mr. Keith for more than two and a half years, following his selection of her as a Program Management Analyst. Keith Decl. ¶ 29; Keith Dep. 16:7–21. Ms. Maldonado had

---

[1] Defendant states that "Mr. Keith was the most knowledgeable about the necessary qualities for the prospective selectee since he had the best knowledge of the agency programs, the experience and leadership qualities the selectee would need to possess in order to perform the new position's duties effectively, and the vision for advancing the agency programs to the next level." Def.'s Br. 7 (citing Keith Decl. 9; Pl.'s Dep. 158:24–25; 159:1–3). Ms. Maldonado disagrees with this assessment, stating that she "actually served in the actual position of Supervisory Program Management Analyst for three (3) months and reported to Elaine Kingston." Pl.'s Resp. 2. It is unclear whether Ms. Maldonado is suggesting that it was she, and not Mr. Keith, who was most knowledgeable about the position due to her brief post in the position. Defendant does not deny that Ms. Maldonado served in the position for three months. Ms. Maldonado's conflicting view creates no material factual dispute. Regardless of who actually possessed superior knowledge about the job qualifications, it is undisputed that Mr. Keith had been designated the Selecting Official to fill the Position. Keith Decl. ¶ 9.

also served as the "acting" supervisor of Support Services from September 27, 2009 through January 2, 2010, (a period of about three months), Keith Decl. ¶ 19, and reported to Ms. Kingston during that time. Pl.'s Resp. 2.

In August, Ms. Maldonado applied for the Position hoping to fill it on a permanent basis. Ms. Maldonado had learned of this opening directly from Mr. Keith, as well as through an email notification. Def.'s Br. 8. She was one of four candidates who were interviewed for the job. Def.'s Br. 10.

**Ms. Hutton**

Ms. Hutton was one of the four candidates selected for interview, Def.'s Br. 10, and ultimately became the one selected to fill the position. Def.'s Br. 19. She was twenty-nine years old when she was interviewed, with seven years of prior professional experience, Pl.'s Resp. 4, along with a Bachelor's Degree in Accounting. Pl.'s Resp. 11. She had previously been supervised by Mr. Roy Higgins, the Accounting HPO Director. Def.'s Br. 18–19. Mr. Keith did not know Ms. Hutton prior to her interview for the Position. Def.'s Br. 12.

**The Selection Procedure**

The Recruitment and Placement Office, DFAS Human Resources, oversees the selection process for all recruitments and placements within DFAS. Mullins Decl. ¶ 4. Beginning with the first step when approval is obtained to fill the vacancy, each subsequent stage of the process is conducted in a collaborative manner involving either Mr. Keith or Ms. Kingston and DFAS Human Resources staff member(s). Def.'s Br. 4–5.

3

At the time relative to this case, Elaine Kingston was Director of Research Management. She, together with Mr. Keith, secured the appropriate approval to fill the vacancy and then submitted the official announcement to begin the recruitment process to fill the Position. Keith Decl. ¶ 7. The Vacancy Announcement for the Position ran from August 13–23, 2010, and was open to all current federal employees as well as other eligible individuals. Keith Decl. ¶ 8; Kingston Decl. ¶ 7; Exhibit A to Mullins Decl.

DFAS Human Resources supervises the two steps established for filling professional/analytical vacancies including the Position at issue here. Both of these stages must follow prescribed procedures. First, the selecting official chooses whether to use a "rating and ranking panel"; that choice is discretionary. Stafford Decl. ¶ 9. Here, a panel was employed. Def.'s Br. 9. After this decision is made, the selecting official interviews each candidate who has advanced past the first step. Again, the selecting official is authorized to decide whether to conduct these interviews individually or whether to enlist an interview panel. Mullins Decl. ¶ 9; Kingston Decl. ¶ 17. Here, the selecting official, Mr. Keith, chose to interview the candidates individually, without a panel. This decision was approved by Ms. Stafford, who was the Human Resource Liaison who worked between Human Resources and the Enterprise Management Services. Def.'s Br. 5, 10.

The selection process fully complied with the procedures developed by Mr. Keith and approved by Ms. Stafford. Included in the materials prepared to inform the hiring decision were the panel member recommendations, draft proposed resume grading criteria outlining the qualifications needed for the position, interview questions, and proposed questions for the prospective selectee's prior supervisors, if references were to be contacted following the interviews. Def.'s Br. 7–8.

4

The first stage of the selection process involved the receipt and ranking by the panel of a certificate of eligible candidates and their resumes.  The rankings were required to comport with pre-established selection criteria. The scoring criteria established for the Position was based on a total of 100 possible points, broken out into subcategories: a maximum of 55 points could be assigned for Experience; 20 for Education; 10 for Certifications; and 15 for "Other." Stafford Decl. ¶ 11. The determination by the panel that a candidate qualified for an interview also meant that he or she was qualified for final hiring into the Position. Mullins Decl. ¶ 10.

Here, Human Resources reviewed the applications submitted from which it created a list of the names of all candidates who met minimum qualifications who were then referred to the rating and ranking panel. Pl.'s Dep. 98:7–18. Mr. Keith, Susan Gillison, and Barbet Lamberg all served as that panel. Keith Decl. ¶ 10; Exhibit D attached to Mullin's Decl. The panel evaluated each resume based on the grading criteria, Keith Decl. ¶ 10, and assigned scores to applicants' resumes based on experience and education, as detailed above.

Next, each applicant who advanced past the first stage was required to respond to identical questions put to everyone in the same order. Mullins Decl. ¶ 9. Their answers were scored and tallied separately from the scoring performed by the rating and ranking panel. Stafford Decl. ¶ 16. The selecting official scored each candidate during his/her interview, without regard to whether the interviews were conducted by the selecting official individually or with a panel. Stafford Decl. ¶ 15. Because each candidate who had succeeded in being referred by the panel as part of stage one of the process was deemed qualified to actually fill the Position, the in-person interview served to identify those who would be the best fit for that spot. Mullins Decl. ¶ 10; Stafford Decl. ¶ 16. Through the interview process, the selecting official was able to

evaluate each candidate's presentation style as well as his or her facility in responding to questions. Def.'s Br. 6.

The four candidates receiving the highest scores from the rating and ranking panel were offered interviews. Keith Decl. ¶ 12. These four included Monica Hutton, who ultimately was selected to fill the Position; Ms. Maldonado as well as two other individuals were also finalists. Keith Decl. ¶ 12. Having advanced to the interview stage, each candidate was considered qualified to hold the position, each candidate, therefore, began the interview process on equal footing. Keith Decl. ¶ 16; Stafford Decl. ¶ 16; Mullins Decl. ¶ 10.

Prior to these interviews, Mr. Keith had been familiar with Ms. Maldonado and one other candidate who also was not selected for the Position.  He did not have any acquaintance with Ms. Hutton or another interviewee. Keith Decl. ¶ 16.

**Interviews**

Mr. Keith, with Ms. Stafford's approval, elected to conduct the interviews individually, rather than with the assistance of a panel. Keith Decl. ¶ 12. Keith Dep. 31:9–21. Seven standard interview questions were formulated and approved for use in interviewing the top four candidates. Keith Decl. ¶ 12. Each question was assigned a certain number of points, the maximum number of points for all seven questions totaling 100. Keith Decl. ¶ 15. Mr. Keith took handwritten notes during each interview and immediately after each interview allocated the number of points for each question as to each candidate. Keith Decl. ¶ 15.

Even though Mr. Keith was acquainted with Ms. Maldonado prior to her interview, he informed her that in terms of vying for the Position she should not rely on that knowledge or

experience with her; she would have to convince him in her interview that she was the best person for the position. Keith Decl. ¶ 17.

During her September 29, 2010 interview, Mr. Keith took notes of Ms. Maldonado's responses, utilizing the approved interview question sheet. Keith Decl. ¶ 15; Exhibit D attached to Keith's Decl. Mr. Keith thought that Ms. Maldonado had performed well on questions 2 and 3, scoring her answers at a level exceeding eighty percent of the maximum possible points on each. Keith Decl. ¶ 18. However, he gave her lower scores on the remaining five questions. Keith Decl. ¶ 18. Specifically, in response to question 5, Ms. Maldonado was unable to provide any examples of performance metrics or processes she would employ in evaluating the organizational health of an agency program. Pl.'s Dep. 123:17–25; 124:8–25; 125:1–2. Additionally, she omitted from her responses any examples of process improvements she had previously implemented when she served as the "acting" supervisor for Support Services between late September 2010 and early January 2010. Keith Decl. ¶ 19. DFAS senior leaders place a high priority on metrics or accountability measurements to evaluate the effectiveness of organizations or programs. Keith Decl. ¶ 18. Ms. Maldonado apparently left Mr. Keith with the impression that she was resistant to the idea of establishing metrics, when she stated during her interview that "agency programs did not always produce widgets." Keith Decl. ¶ 18. Thus, Ms. Maldonado was awarded a score of only 79 out of a possible 100 points for her interview. Keith Decl. ¶ 19.

In contrast, Mr. Keith interviewed Ms. Hutton, who ultimately was hired for the position, according to Mr. Keith provided clear, thorough, compelling responses to his questions.  He viewed her to possess the type of communication skills, program planning and management experience, leadership skills, and ability to implement performance metrics and process improvements that were necessary to implement the vision he had established for the Agency

7

Program Management Office. Keith Decl. ¶ 20. Mr. Keith further stated that Ms. Hutton clearly explained her program management experience and the way(s) in which it improved her leadership abilities, including her success with a team of accountants whom she guided to a place where they were able to successfully reduce delinquent Accounts Receivables by $2 billion for the Air Force; this was credited with being the third best process improvement within the Department of Defense. Keith Decl. ¶ 20.

Mr. Keith viewed the quality of Ms. Hutton's answers with respect to metrics to be far superior to Ms. Maldonado's. Keith Decl. ¶ 21. Ms. Hutton had indicated that if put in the Position for which she was vying she would confer with the Support Services Director to determine which programs had the highest potential for metric development and then attempt to customize the metrics based on the different programs. Keith Decl. ¶ 21. She also planned to perform an evaluation of the effectiveness of the current metrics, analyze the available resources, and assess personnel skills in order to establish an appropriate baseline for training.  She also planned to develop measurements to evaluate the effectiveness of her staff's interactions with customers through site visits, teleconferences and/or working groups. Keith Decl. ¶ 21. Mr. Keith assessed Ms. Hutton's ability during the interview to communicate her vision as "exceptionally well." Keith Decl. ¶ 21. Mr. Keith's interviews were concluded on Thursday, September 30, 2010, and he determined at that point that Ms. Hutton was the best candidate to lead the Program Analysts. Keith Decl. ¶ 23. Ms. Hutton had achieved a total score of 87 out of a possible 100 points, which result was a full 8 points higher than Ms. Maldonado's. Def.'s Br. 17.

**Selection of Ms. Hutton**

In his capacity as selecting official, Mr. Keith signed the Resumix Referral List recording his selection of Ms. Hutton for the Position. Keith Decl. ¶ 22; Exhibit K attached to Mullins Decl. Before submitting the Referral List to Ms. Kingston, Mr. Keith contacted Ms. Hutton's past supervisor and reference, Roy Higgins, the Accounting HPO Director, to elicit his response(s) to the approved questions. Keith Decl. ¶ 23. Mr. Keith again recorded in his notes the information gleaned from his conversation with Mr. Higgins, (Keith Decl. ¶ 23; Exhibit E attached to Keith Decl.), who stated that in his opinion, Ms. Hutton had the ability to see the big picture, was an "excellent" performer under pressure, and always delivered first-class work products. Keith Decl. ¶ 24. Mr. Higgins also informed Mr. Keith that Ms. Hutton had briefed senior DFAS leadership on multiple occasions and that he would "absolutely" hire her back again if the opportunity arose. Keith Decl. ¶ 24.

Mr. Keith next contacted Ms. Kingston to explain his decision for recommending Ms. Hutton as the best candidate for the position. Keith Decl. ¶ 27. Ms. Kingston agreed with Mr. Keith's assessment, affirming the importance of strong leadership skills and an ability to achieve successful results in the Position. Kingston Decl. ¶ 18. Ms. Kingston also thought Ms. Hutton was an excellent choice.

Having completed the final stage of the hiring process, Mr. Keith provided the Resumix Referral List to Ms. Stafford, setting the stage for the selection of Ms. Hutton to fill the position. Keith Decl. ¶ 26.

9

**Mr. Keith's Prior Hiring Practices**

In the course of performing his duties with DFAS, Mr. Keith had previously selected for hiring Susan Richards, who was in her 30s; Jennifer Dick, who was in her 20s; and Maryann Pachmeyer, who was in her 50s, each of whom served in 120-day temporary assignments as his Executive Assistants. Pl.'s Resp. 5; Def.'s Reply Br. 4.

Ms. Maldonado in leveling her charge of discrimination cites her experience when she had occasion to enter a meeting with Mr. Keith and Ms. Richards, she alleges that "they would engage in giggling and nonverbal conduct which made [her] uncomfortable." Pl.'s Resp. 5.

When Ms. Maldonado was not selected for the Position, she believed it was a decision based on her age.  This lawsuit ensued.

## Legal Analysis

### I.     Summary Judgment Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt

as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th

Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II.     Discussion

An ADEA plaintiff may defeat a motion for summary judgment by showing a genuine issue as to whether the employer discriminated against her on the basis of her age. This can be accomplished using either the direct or indirect methods of proof. *Jordan v. City of Gary, Inc.*, 396 F.3d 825, 831-32 (7th Cir. 2005). We find that the evidence Ms. Maldonado has presented fails under both methods.

Ms. Maldonado presents insufficient evidence to defeat a motion for summary judgment under the direct method. Proving discrimination via direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). No such evidence exists in Ms. Maldonado's case. A plaintiff may also prevail under the direct method if she can construct "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional

discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Courts in this circuit typically point to the following three categories of circumstantial evidence on which a plaintiff may rely in the employment discrimination context to make such a showing:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted).

Ms. Maldonado points to the following two pieces of circumstantial evidence in support of her claim: (1) that Mr. Keith previously "circumvented the Defendant's hiring procedures for the benefit of younger females when he hired Susan Richards, who is in her 30's, and then Jennifer Dick, who is in her 20's, as his Executive Assistants"; and (2) that "when [Ms.] Maldonado would enter a meeting with Keith and Richards, they would engage in giggling and nonverbal conduct which made Maldonado uncomfortable." Pl.'s Resp. 9.

This evidence fails to raise an inference of intentional discrimination. The fact that Mr. Keith hired two substantially younger individuals to serve in temporary assignments as his Executive Assistant raises no suspicion when one considers that Mr. Keith also had hired Maryann Pachmeyer, an employee in her 50's, to serve in the same 120-day temporary assignment. Def.'s Reply Br. 4. Furthermore, there is no evidence that the Defendant's hiring process was ever "circumvented" in Ms. Maldonado's case.  Mr. Keith's actions throughout the hiring process were conducted according to pre-established procedures and under the supervision of DFAS Human Resources. As the selecting official, Mr. Keith was entitled to, and did choose to use a "rating and ranking panel." Stafford Decl. ¶ 9. He also had the discretion to conduct

13

individual as opposed to panel interviews, (Mullins Decl. ¶ 9; Kingston Decl. ¶ 17), a decision that was conveyed to and approved by Ms. Stafford, the Human Resource Liaison between Human Resources and the Enterprise Management Services. Def.'s Br. 5, 10.

 Ms. Maldonado's recollection that Mr. Keith and Ms. Richards would "engage in giggling and nonverbal conduct," raises no inference of intentional discrimination. Furthermore, Ms. Maldonado fails to acknowledge that it was Mr. Keith who selected her for a promotion in 2008. *See Blasdel v. Northwestern Univ.*, 687 F.3d 813, 820 (7th Cir. 2012) (courts may consider on summary judgment the fact that the same person hired and later fired the employee in determining whether sufficient evidence of discrimination has been shown.)

 Even viewing the facts in a light most favorable to Ms. Maldonado, as we are required to do at this stage in the litigation, it is clear that she has failed to meet her burden under the direct method of proof.

 Ms. Maldonado's attempt to prove discrimination indirectly within the *McDonnell Douglas* burden-shifting framework also falls short.[2] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under this method of proof, a plaintiff must begin by establishing a prima facie case of discrimination, which requires a showing that: (1) she is a member of a protected class; (2) her performance met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the adverse action indicate that it is more likely than not that her age was the reason for it, which may be demonstrated by showing that her employer treated similarly situated employees outside of the protected class more favorably. *See Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830 (7th Cir. 2007).  If a plaintiff succeeds in establishing a prima facie case of discrimination, the burden

---

[2] This approach applies to claims brought under the ADEA. *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 559 (7th Cir. 2007) (citing *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006)).

then shifts to defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff. If defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts back to plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005).

The parties do not dispute, and we agree, that Ms. Maldonado, whose age is higher than forty years, is a member of a protected class, that she was meeting legitimate job expectations, and that she suffered an adverse employment action. Nor do the parties dispute that Ms. Hutton, who is 29 years old and thus outside of the protected class, was treated more favorably, in that she was hired into the position denied to Ms. Maldonado.

DFAS claims that it had a legitimate, nondiscriminatory reason for not selecting Ms. Maldonado: Ms. Maldonado did not score as well as did Ms. Hutton during her interview, underscoring their conclusion that Ms. Hutton was the best candidate for the position. Def.'s Br. 2.

The burden therefore shifts to Ms. Maldonado to show that DFAS's proffered reason is pretextual, which means "a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147–48 (2000)). It is not within our purview to determine whether DFAS's decision not to select Ms. Maldonado was a correct and prudent decision; as long as the evidence makes clear that DFAS honestly believed at the time that the selection for the position was made that Ms. Maldonado was not the best candidate for the position and that Ms. Hutton was, Ms. Maldonado cannot succeed in sustaining her burden to

establish pretext. However, if DFAS's explanation rings false, we may infer that the employer is attempting to cover up a discriminatory purpose. *See Reeves*, 530 U.S. at 147.

In her attempt to demonstrate pretext, Ms. Maldonado argues (1) that she was more qualified than Ms. Hutton for the position, and (2) that Mr. Keith interviewed the candidates individually, and thus, his opinion that Ms. Hutton was more qualified is "subjective." Pl.'s Resp. 11–12. We view both of these arguments as unavailing.

In arguing that she was more qualified than Ms. Hutton, Ms. Maldonado faces a high hurdle. "[W]here an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext 'unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.'" *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (quoting *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277 (5th Cir. 1999)). "In other words, in effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id.* (internal quotation marks and citations omitted).

Ms. Maldonado alleges that no reasonable person could find that Hutton was more qualified than she was. To establish this conclusion, she cites three reasons. First, she "served in the actual position of Supervisory Program Management Analyst for three (3) months and reported to Bruce Keith's boss, Elaine Kingston." Second, Ms. Hutton was 29 years old while she on the other hand "had completed twenty-nine years of federal service, 18 of which were

spent performing program management." Third, she has a Master's Degree in Management, while Ms. Hutton has merely a Bachelor's Degree in Accounting. Pl.'s Br. 11.

We hold that a reasonable person could find that Ms. Hutton was more qualified than Ms. Maldonado, despite the candidates' differences in education and experience. The candidates' respective education and experience was fully considered during the initial step in the application process, when the panel reviewed each applicant's resumes. Stafford Decl. ¶¶ 8, 9; Kingston Decl. ¶ 7. Each individual who had been referred by the panel in stage one was deemed qualified to hold the Position, and in fact both Ms. Maldonado and Ms. Hutton were among the top four candidates at the conclusion of the first stage. Thus, they were both determined to be qualified, despite their differences in education and experience. After the first stage, the candidates began the second stage on an equal footing. Keith Decl. ¶ 16.  It was the in-person interview that provided the critical basis for the decision as to which candidate was the best fit for the organization. Mullins Decl. ¶ 10; Stafford Decl. ¶ 16. The interview explored measurements and indicia of merit beyond merely education and experience, providing the selecting official with an opportunity to evaluate each candidate's presentation style and ability to respond to questions in a logical, organized way. Def.'s Br. 6. Ms. Maldonado has presented no evidence to undermine Mr. Keith's conclusion that Ms. Hutton's answers during the interview were better than Ms. Maldonado's or to challenge that fact that Ms. Hutton's total interview score came in 8 points higher than Ms. Maldonado's, Def.'s Br. 17.  Based on these facts, a reasonable person could conclude that Ms. Hutton was better qualified for the position than Ms. Maldonado. In short, there simply is nothing about Mr. Keith's reliance upon these other measures of merit beyond education and experience—such as oral presentation skills—to support an inference of a discriminatory motive.

Ms. Maldonado also contends that pretext is established by the fact that Mr. Keith interviewed the candidates individually and that therefore his opinion about which candidate was best qualified for the position was merely "subjective" and unworthy of credit. Pl.'s Resp. 11–12. However, employers are not prohibited from relying on subjective criteria when promoting employees. *See Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005) (affirming summary judgment and noting that "[t]his court has … never held that a job interview must be scored according to some sort of objective criteria"); *Millbrook*, 280 F.3d at 1176 ("[S]ubjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy . . . .") (quotation marks and citation omitted).

Nothing about Mr. Keith's decision to conduct the interviews individually directly supports an inference of discriminatory motive or pretext. As the selecting official, Mr. Keith was vested with the discretion to conduct interviews individually. Mullins Decl. ¶ 9; Kingston Decl. ¶ 17. His decision to do so was known to and approved by Ms. Stafford, the Human Resource Liaison between Human Resources and the Enterprise Management Services. Def.'s Br. 5, 10. Mr. Keith's interviews followed the defendant's pre-established procedures for conducting such interviews. The seven interview questions had been submitted to and approved by Ms. Kingston for use with the top four candidates well before the identity of each of the candidates was known. Keith Decl. ¶ 12. Mr. Keith recorded his impressions as well as the candidates' responses in his notes during each interview using the approved interview question lists.  He assigned the point tallies for each candidate also immediately after each interview. Keith Decl. ¶ 15. Ms. Maldonado does not dispute that Mr. Keith's notes accurately reflect her responses to his questions, nor does she claim that the questions were inappropriate in any way.

Maldonado Dep. 132:24–25; 133:1–25; 134:1–14. We simply cannot conclude on the basis of these facts that an inference of pretext has been established. None of the evidence identified by Ms. Maldonado, either alone or in combination, raises an inference of pretext.

Thus, Ms. Maldonado has failed to establish any genuine issue of fact relating to whether her employer had discriminated against her on the basis of age. Her evidence fails under both the direct and indirect methods of proof.

### III.    Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment [Docket No. 30] is <u>GRANTED</u>.  Final judgment will be entered accordingly.

IT IS SO ORDERED.

Date:  _____12/06/2013

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

19

Distribution:

Joel Samuel Paul
RAMEY & HAILEY
joel@rameyandhaileylaw.com

Debra G. Richards
UNITED STATES ATTORNEY'S OFFICE
debra.richards@usdoj.gov

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
gerald.coraz@usdoj.gov